## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MURLIN R. PHILLIPS,                    )
                                       )
                Petitioner,            )
                                       )
        v.                             )        Case No. 4:04cv1483 TCM
                                       )
IAN WALLACE,[1]                        )
                                       )
                Respondent.            )

## MEMORANDUM AND ORDER

This 28 U.S.C. § 2254 action is before the Court for review and final disposition

pursuant to the written consent of the parties. See 28 U.S.C. § 636(c). Also pending are

various motions filed by Murlin R. Phillips ("Petitioner").

## Background

Criminal Trial Proceedings. Petitioner pled guilty on April 1, 2002, to one count of

second degree murder and one count of armed criminal action. (Resp. Ex.[2] A, ECF No. 9.)

The plea was before Judge J. Max Price in the Circuit Court for Wayne County, Missouri.

(Id.) Petitioner had been charged by a felony complaint on October 9, 2000, with one count

of first degree murder and one count of armed criminal action. (Resp. Ex. M at 7-8, ECF No.

---

[1]Petitioner is now confined in the Southeast Correctional Center; consequently, the Warden there, Ian Wallace, is substituted as the proper Respondent. See Rule 2 (a), Rules Governing Section 2254 Cases in the United States District Courts.

[2]Exhibits have been submitted by Petitioner and Respondent. Some of the exhibits have been filed by both; some of Petitioner's exhibits have been filed by him more than once. For ease of reference only, the Court will cite to the exhibit first filed, regardless of whether the filing was made by Petitioner or Respondent.

45.) The charges arose from the death of Wayne Limbaugh. (Id.) The range of punishment on count one was "[d]eath; or imprisonment for life without eligibility for probation or parole, or release expect [sic] by act of the governor." (Id. at 7) Three days later, Petitioner was arraigned on those charges. (Id. at 10.) He was then represented by Donald Rhodes. (Id.)

The month after his arraignment, a preliminary hearing was held at which Joan Burton and Phillip Burton testified. (Pet'r Ex. 32, ECF No. 37.) Ms. Burton testified that she and Limbaugh arrived at her house at approximately six o'clock in the evening on October 8, 2000, and were to be joined by another couple. (Id. at 6-8.) She heard someone pull into her driveway and then heard Limbaugh tell her the couple were there and tell the couple to come in. (Id. at 8.) Petitioner came in. (Id.) She and Petitioner had dated for approximately three years; she and Limbaugh had known each other for approximately one month. (Id. at 6, 7, 30.) She had spoken with Petitioner over the telephone after she and Limbaugh had arrived at her house and had told him no one was with her. (Id. at 9.) When Petitioner came into her house, he asked her who the man in the living room was; she replied he was a friend and asked Petitioner to leave. (Id. at 10.) He suddenly did at the same time the couple arrived. (Id.) She, Limbaugh, and the couple ate dinner and played cards until approximately ten o'clock at night. (Id. at 11.) The couple left. (Id.) Limbaugh was getting ready to leave when Petitioner returned. (Id. at 11-12.) She told Limbaugh to lock the front door and storm door. (Id. at 12.) She spoke to Petitioner through the kitchen window, asking him to leave.

(Id.) She closed the window, started to go into the living room, and realized Limbaugh had left through the front door. (Id. at 13.) She saw Petitioner punch Limbaugh in the face. (Id.) She turned to get the telephone, heard Limbaugh holler, and then heard a gunshot. (Id.) She started for the front door and was met by Petitioner. (Id. at 14.) He had a gun in his hand. (Id.) He put the gun to her head and threatened to shoot her. (Id. at 15.) She begged him not to. (Id.) Eventually, he and she sat on the bed to talk. (Id.) He heard the telephone ring, heard a neighbor leaving a message on her answering machine, heard the telephone ring again, and shot at the answering machine. (Id. at 16-17.) The bullet missed the machine and went through her night stand and three walls. (Id. at 17.) She tried to talk Petitioner into letting her take him to the hospital. (Id. at 19.) They left the house in her car, drove by an accident scene and saw Limbaugh's truck, and, after hours of driving around, ended up at the Veterans' Administration ("VA") Hospital in St. Louis. (Id. at 19-22, 30-39.)

Over the objection of Mr. Rhodes, the autopsy report of Russell D. Deidiker, M.D., was admitted into evidence "for purposes of the Preliminary Hearing only." (Id. at 42.)

Phillip Burton, a law enforcement officer with the Wayne County Sheriff's Department, testified that he responded to an accident on October 8, 2000; heard en route to the accident that the driver had possibly been shot; and smelt a "moderate" odor of alcohol in the truck involved. (Id. at 44-45, 47.) He was present when Limbaugh's body was autopsied and saw a bullet hole in his back and an exit wound in his left chest. (Id. at 46-47.) Joan Burton (Burton) then testified Limbaugh had drunken beer – she remembered only that

it was more than one – between noon and when they arrived back at her house in the evening and had not drunk any alcohol after that.  (Id. at 54-56.)

The judge found probable cause.  (Resp. Ex. M at 12.)  Petitioner was charged by felony information with the same two counts as before with the same ranges of punishment. (Id. at 13-15.)

Mr. Rhodes moved for disclosure and for a mental examination of Petitioner.  (Id. at 16-19.)  He also filed a one-sentence request for a change of judge, who was then William Camm Seay.  (Id. at 2, 19.)  Petitioner's request was granted; his case was transferred to Judge Price.  (Id.)  Judge Price granted Petitioner's request for a mental examination.  (Id. at 20-21.)

Byron C. English, Ph.D., a certified forensic examiner, examined Petitioner and reported in May 2001 his conclusions that Plaintiff was not suffering from a mental disease or defect that would interfere with his capacity to understand the proceedings against him or to assist in his case.  (Id. at 22-37.)  Also, Petitioner was not suffering then or at the time of the alleged crime from a mental disease or defect which prevented him from knowing or understanding his conduct or from conforming that conduct to the law.  (Id. at 37.)  Included in Dr. English's report was a summary of Petitioner's version of the incident.  (Id. at 24-25.) Remembering the incident as having occurred on October 9, Petitioner recalled driving to Burton's house after seven o'clock that evening and after she hung up on him after telling him not to call her, leaving the house after seeing a couple arrive, returning to the house later that

night as the couple was leaving, and seeing that the man who had been there earlier was still there. (Id.) Petitioner got out of his truck, taking his pistol with him in the side of his belt "'in case the man caused problems.'" (Id. at 25.) The man was leaving, asked Petitioner what the matter with him was, and was angry. (Id.) Petitioner felt threatened. (Id.) He hit the man in the chin. (Id.) Petitioner's pistol started to slide down his pants. (Id.) Afraid that the pistol was going to fall on the deck, he took it out of his pants. (Id.) Limbaugh saw the pistol, put up his fists, and, rather than swinging at Petitioner, turned to run. (Id.) "[T]he 'gun went off.'" (Id.) Petitioner "indicated he pulled the trigger once." (Id.) Limbaugh was sitting, holding his arm; Petitioner went into Burton's house. (Id.) It was noted later in the report that Petitioner said he could not remember "squeezing the trigger on the gun." (Id. at 36.) It was also noted that Petitioner was aware that he could move for a change of venue if he felt he could not get a fair trial in Wayne County and that Petitioner reported that the bullet that hit Limbaugh was never found. (Id. at 35.) He was not sure if he would be found guilty because he did not know "if the wreck killed [Limbaugh] or not.'" (Id.) Dr. English diagnosed Petitioner with generalized anxiety disorder and, because Petitioner had previously been treated for post-traumatic stress disorder ("PTSD") due to his service in Vietnam, PTSD by history. (Id. at 33-34.)

After two continuances, Petitioner's trial was set for April 1, 2002. (Id. at 2-3.)

On March 25, Jasper N. Edmundson (Edmundson), who had been retained by Petitioner and was then representing him, wrote Petitioner that the prosecutor's offer was to

"stand silent" and "allow [Petitioner] to plead to murder in the second degree." (Pet'r Ex. No. 12, ECF No. 37-76.) Edmundson opined that this was "the best possible resolve of the matter." (Id.) He anticipated discussing this with Petitioner within two hours and further informed him that the prosecutor needed an answer by four o'clock that afternoon. (Id.)

On April 1, the prosecutor filed an amended felony information charging Petitioner with one count of second degree murder and one count of armed criminal action. (Resp. Ex. M at 38-40.) The first count read, in relevant part, that Petitioner, in violation of Mo.Rev.Stat. § 565.021, had "intentionally, premeditatedly, with malice aforethought and unlawfully caused the death of Wayne G. Limbaugh, by shooting him, thereby causing him to die on October 8, 2000 . . . ." (Id. at 38.) The range of punishment was "[l]ife imprisonment; or imprisonment for a term not less than (10) years and not to exceed thirty (30) years." (Id.)

As noted above, that same day, Petitioner, represented by Edmundson, appeared before Judge Price. (Resp. Ex. A, ECF No. 9.) Edmundson informed the judge that he had received a copy of the amended information that morning and had had time to go over the information with Petitioner. (Id. at 2.) Petitioner informed the judge that he did not need anymore time to go over the amended charge with Edmundson. (Id.) Petitioner, under oath, testified that his earlier statements about not needing more time and about understanding the ranges of punishment for the two amended counts were the same as if they had been given under oath. (Id. at 3-4.) Petitioner was then questioned about whether he understood he was

waiving various constitutional rights, including the right to call witnesses, to be presumed innocent, and to have a change of venue on "application properly filed." (Id. at 4-8.) Judge Price asked Petitioner about whether any threats or promises had been made to cause him to plead guilty and whether any promises had been made about the sentence other than the plea bargain agreement. (Id. at 8.) Petitioner replied "No" to each question. (Id.) He replied "Yes" in response to the judge's question whether he understood that no one could promise him what his sentence would be, that any such promise would not be binding on the court, and that the court could impose any sentence with the range of punishment permitted by law. (Id.) He answered "Yes" to the question whether he was pleading guilty because he was guilty and was admitting that he had committed the offense charged. (Id.) After reading Count I, the judge asked Petitioner if the allegations were correct. (Id. at 9.) Petitioner replied, "It was October the 9th, but yes." (Id.)

On further questioning, Petitioner testified that he was satisfied with Edmundson's services, that he had had "time to reflect on the amended charge," and that he had had all the time he needed to go over it with Edmundson. (Id. at 10-11.) Edmundson had not failed to do anything Petitioner asked him to do and had not done anything Petitioner had asked him not to do. (Id. at 11.) Petitioner was satisfied with Edmundson's representation and had no complaints. (Id. at 11-12.)

On being asked by the judge to briefly state what the facts would be, the prosecutor replied as follow.

Judge, the state would provide testimony from various witnesses and law enforcement officers as well as crime lab personnel endorsed on the felony information that would prove to a jury or other trier of fact beyond a reasonable doubt, on or about the date charged in the information, October 8, 2000, . . . that [Petitioner] initially accosted . . . [Limbaugh], at the residence of a woman named Joan Burton, with which [Petitioner] had a previous relationship. The altercation was broken off, [Limbaugh] and Ms. Burton had dinner with another couple, following the leaving by the other couple upon the residence of Ms. Burton, the testimony would be that a shot was fired and that Ms. Burton came out and saw Mr. Limbaugh leaving. She would also testify that at that point [Petitioner] took her on a route throughout Southeast Missouri and eventually ended up in a hospital in the St. Louis area which a .9 mm pistol was turned over to authorities there. That pistol was later determined to be the same piston, based on ballistics analysis, that was utilized to fire a shot, which was determined by the forensics expert to be a fatal wound to Wayne Limbaugh. Mr. Limbaugh did flea [sic] the scene with the gunshot wound, eventually ended up in an automobile accident and indicated to the ambulance personnel that he had been shot . . . . He expired a short time later . . . . [Petitioner] . . . also gave various statements after having been Mirandized, that would tend to implicate him in the eyes of a jury as well as the testimony of Joan Burton, who would testify concerning statements which [Petitioner] made to her concerning this matter.

(Id. at 13-14.)  Petitioner stated that he did not start the altercation, but he did agree that the prosecutor had summarized what his evidence would be.  (Id. at 16.)  He further stated that the witness (Burton) did not see Limbaugh leaving, that he had assumed Limbaugh "was shot in the arm or something," and that Limbaugh had started the altercation "by coming out on the deck."  (Id. at 16-17.)  Again asked if he was not disputing the prosecutor's statement of what his evidence would be and whether he was "freely and voluntarily entering a plea of guilty to Counts I and II," Petitioner replied, "Yes."  (Id.)

His plea was accepted and a pre-sentence investigation ("PSI") report was ordered.  (Id. at 17-18.)

The PSI report was filed three weeks later. (Pet'r Ex. 6, ECF No. 37.) The report included Petitioner's recollection of events. (Id. at 47-49.) He recalled Limbaugh turning to run after Petitioner raised his gun to his face – Petitioner had pulled the gun out of his pants, thought about putting it on the iron table, and changed his mind after considering that Limbaugh could then use the gun on him. (Id. at 48.) The gun went off when Limbaugh was turning. (Id.) Petitioner did not remember pulling the trigger. (Id.) Later, in the house with Burton, he shot at the phone and missed. (Id.) In the "Assets and Liabilities" section of the report, a notation was made that Petitioner's former supervisor at the United States Postal Service had described him as a "'lousy' employee." (Id. at 50.) Burton was reported to have stated that Petitioner "threatened to go to [the supervisor] and all the rest and blow them away." (Id.) The report also included a conclusion that Petitioner had displayed no remorse toward Limbaugh or Limbaugh's family. (Id. at 51.) Specifically,

> [w]hen questioned about how he felt about causing the death of another human, [Petitioner] stated, "I wish it hadn't happened. I think he should have stayed in the house and not came out. Another few seconds and I would have been gone. I hate that the man's dead and I hate it for his family. I can't really feel any remorse for it. I feel like he started it. It happened in just a few seconds and there wasn't time to rationalize the whole thing out." . . .

> [Petitioner] shot Wayne Limbaugh as he was attempting to flee the scene, failed to provide any medical attention and passed the accident scene without any regard to Mr. Limbaugh's condition. . . .

(Id.)

Petitioner appeared before Judge Price on May 3, 2002, to be sentenced. (Resp. Ex. A at 19-37.) Limbaugh's daughter spoke about the effect of her father's death on her and her

children.  (Id. at 19-22.)  Edmundson spoke at length and submitted letters in Petitioner's behalf.  (Id. at 23-28.)  The prosecutor then requested leave to speak in rebuttal to Edmundson, and did.  (Id. at 28-30.)  He disputed that Limbaugh was the aggressor.  (Id. at 29-30.)  He did not advocate for a particular sentence.  After Petitioner, under oath, stated that there was no legal cause why sentence should not be pronounced, Judge Price sentenced him to life imprisonment on the second degree murder charge and a concurrent term of twenty-five years on the armed criminal action charge.  (Id. at 32-33.)  He then asked Petitioner if Edmundson had done anything Petitioner had instructed him not to do, if he had any complaints about any law enforcement officers, and if there was anything he wanted to add about Edmundson's assistance.  (Id. at 35-36.)  Petitioner replied that there was not.  (Id.)

On May 17, Edmundson filed a motion to withdraw guilty plea and for new trial, arguing that Petitioner had not been granted a reasonable opportunity to address inaccuracies in the PSI report and the prosecutor violated the plea agreement by not "'stand[ing] silent'" as to Petitioner's punishment.  (Resp. Ex. M at 46-47.)  In June, Edmundson filed a motion to withdraw on the grounds Petitioner had discharged him.  (Id. at 48-49.)  Judge Price heard and granted this motion in August.  (Id. at 4.)  In October, he denied the motion to withdraw the guilty plea and for new trial.

Direct Criminal Appeal.  Twenty days after his motion to withdraw guilty plea was denied, Petitioner filed a motion for leave to file a late notice of appeal.  (Id. at 59-60.)  The following month, in November, Petitioner filed a motion for additional time to file a late

notice of appeal.  (<u>Id.</u> at 80.)  The Missouri Court of Appeals for the Southern District granted his motion and permitted him leave to appeal the judgment.  (<u>Id.</u> at 82.)  Petitioner, proceeding pro se, did.  (<u>Id.</u> at 84.)

Petitioner argued on appeal that (1) the trial court acted in excess of its jurisdiction because Count I of the amended information cited a repealed statute and (2) his plea violated due process and equal protection because (a) there was no factual basis for either charge, (b) he pled guilty to a repealed statute and there was substantial evidence he was actually innocent, (c) the plea agreement was broken and was induced by misrepresentation, mistake, misapprehension, and false hopes, and (d) the plea was not intelligently entered because he was not informed that he could not have acted knowingly if he did not remember firing the gun.  (Resp. Ex. D at 17-18, ECF No. 9.)

In August 2003, the appellate court affirmed the judgment and sentence.  (Resp. Ex. G, ECF No. 9.)  The court's mandate was later recalled; the opinion was withdrawn; and the case was remanded to the trial court for appointment of counsel.  <u>See</u> <u>State v. Phillips</u>, No. SD25243 (Mo. Ct. App. Nov. 23, 2005).

Now represented by counsel, Petitioner argued on appeal that the plea court erred in (1) not dismissing the charges because the second degree murder charge "was insufficient in that it did not include the mental states of either 'knowingly caus[ing] the death of another person' or acting 'with the purpose of causing serious physical injury to another person' as set out in Mo.Rev.Stat. § 565.021.1, thereby depriving [Petitioner] of his due process rights";

(2) failing to reject his guilty pea because he had not admitted facts establishing the necessary mental state for second degree murder; and (3) denying his motion to withdraw guilty plea because his plea was not intelligently entered in that he was misinformed about the mental state necessary for second degree murder. (Resp. Ex. N at 9-12, ECF No. 45.) (First alteration in original.)

Again, the appellate court affirmed Petitioner's judgment and sentence. State v. Phillips, 204 S.W.3d 729 (Mo.Ct.App. 2006). Addressing Petitioner's first point, the court found, in relevant part,

> The information alleged the date and place of the offense. It stated the manner in which [Petitioner] caused the death of the victim – "by shooting him." It further alleged that [Petitioner] did the actions with which he was charged "intentionally, premeditatedly, with malice aforethought." It did not state that he did so "knowingly." This court does not perceive that one could act "intentionally" and "premeditatedly" without acting knowingly. The information did not fail, by any reasonable construction, to charge the offense to which [Petitioner] pleaded guilty simply because the word "knowingly" did not appear in the specification of the charge of murder in the second degree. There is no showing that its absence impacted the preparation of any defense [Petitioner] might have wished to assert, or that it would it have prevented him from asserting double jeopardy had he chosen to go to trial and had he been acquitted.
>
> [T]he only reasonable construction of the information in this case leads to the inescapable conclusion that [Petitioner] was charged with murder in the second degree, the offense of which he was convicted.
>
> Because the language used in the information was compatible with an earlier statute that defined murder in the second degree, the 1978 statutes, [Petitioner] complains that he "was charged under a statute that no longer exists." The information filed in [Petitioner's] case explicitly identified the statute that he was charged with having violated as "Section 565.021, R.S.Mo.," and states the date of the offense as "the 8th day of October, 2000." [Petitioner] was

charged with the offense of murder in the second degree as codified at § 565.021.

Id. at 731-32. Petitioner's second and third points were rejected on the grounds that neither was cognizable on direct appeal. Id. at 732.

Post-Conviction Proceedings. The day after Petitioner first requested leave to file a late notice of appeal, he filed a petition with the trial court for deoxyribose nucleic acid ("DNA") testing, pursuant to Mo.Rev.Stat. § 547.035. (Resp. Ex. C at 6-13.) Petitioner argued that DNA testing of Limbaugh's shirt "and other evidence" would have established that Limbaugh was close enough to Petitioner to pose a threat of imminent danger and that he was partially facing Petitioner and was not, as the state misrepresented, "ambushed from the back." (Id. at 9.) The court denied the petition in November 2003, finding that (a) the requested testing would not prove any of the allegations in his petition; (b) the testing technology was available when Petitioner entered his guilty plea; (d) Petitioner and his trial counsel were aware of the evidence at issue when the plea was entered; (e) identity was not an issue in the case; (f) no reasonable probability existed that DNA testing would lead to exculpatory results; and (g) the files and records conclusively show that Petitioner is guilty of the offenses to which he pled guilty. (Resp. Ex. M at 100-02.)

Petitioner appealed. His appeal was denied. Phillips v. State, 178 S.W.3d 679 (Mo.Ct.App. 2005).

The appellate court having recalled its earlier mandate and issued a new one in November 2006, Petitioner was granted leave until February 2007 to file a post-conviction

motion pursuant to Mo.S.Ct.R. 24.035. (Resp. Ex. S at 9-10.) Petitioner did so. (Id. at 12-19.) His motion was amended by appointed counsel and raised five grounds for relief. (Id. at 20-34.) The first four grounds allege that Petitioner was denied the effective assistance of counsel when Edmundson (1) affirmatively misled Petitioner about the sentence by telling him he would only have to serve three years because of his age and medical conditions; (2) misinformed him of the terms of the plea offer by not telling him that "standing silent" did not mean that the prosecutor would say nothing at the sentencing hearing and meant only that the prosecutor would not recommend a particular sentence; (3) failed to conduct a reasonable investigation,[3] leaving him no choice but to plead guilty; and (4) failed to advise him of the elements of second degree murder, elements which Petitioner did not meet because he could not remember pulling the trigger and did not knowingly act to cause Limbaugh serious injury. (Id. at 29-30.) The fifth ground is that the trial court erred by not requiring that there was a sufficient factual basis for his guilty plea. (Id. at 30.) Specifically, there was no evidence that the shooting was "done knowingly" and was not either self-defense or an accident. (Id. at 31-32.)

Before any testimony was taken at the first evidentiary hearing, the judge noted that Mr. Rhodes had taken a change of judge when he, William Camm Seay, was originally

---

[3]Petitioner alleges that a reasonable investigation would have revealed that Limbaugh "had a reputation in the community for aggressive, assaultive, drunken behavior." (Resp. Ex. S at 27.) This reputation plus the chain of events that night presented a viable case for self-defense. (Id. at 27-28.) An investigation would also have led to the discovery that Limbaugh died as a result of the motor vehicle accident, and not the gunshot wound. (Id. at 28-29.)

assigned to preside over Petitioner's criminal case. (Pet'r Ex. 36 at 4-5, ECF No. 37.) Judge Seay then asked Petitioner and his attorney whether each was comfortable with him presiding over the post-conviction motion proceedings. (Id.) Each was. (Id.)

Petitioner and his brother, Verlon Phillips, were the only witnesses to testify. Petitioner testified that the only plea offer Edmundson told him of was one he relayed on the day trial was to begin. (Id. at 7.) That offer was that the prosecutor would remain silent, which Petitioner understood to mean he would not say anything. (Id. at 8.) Edmundson also told him he would get out in three years. (Id. at 11.) If Petitioner had known that a victim's impact statement, e.g., Limbaugh's daughter's testimony, would be submitted, he would not have pled guilty. (Id. at 13, 28.) If the judge had asked him if he murdered Limbaugh, he would have said he did not do so knowingly because he did not remember pulling the trigger. (Id. at 19.) If he had been told he had to have acted knowingly to commit second degree murder, he would not have pled guilty and would have insisted on going to trial. (Id.) In response to questions about whether he had answered as reflected in the change of plea hearing transcript, e.g., answering "yes" to the question whether he was admitting to the allegations in Count I, "no" to the question whether anyone had made him promises about his sentence, and "yes"to the question whether he understood that no one could make him such promises, Petitioner explained that his answers were the only way he could get the plea bargain. (Id. at 22-25, 26-27, 30.) Petitioner testified he had lied, or been "greatly mistaken," at the change of plea hearing. (Id. at 38.)

Verlon Phillips testified that Edmundson had told him and Petitioner that the sentence "could be life or ten years minimum." (Id. at 44.) He told them that "no problem it'd be ten years minimum" less time served. (Id.)

Three and one-half years later, a second evidentiary hearing was held.[4] (Pet'r Ex. 35, ECF No. 37.)

Edmundson testified that his investigation of Petitioner's case included obtaining Mr. Rhodes' file, including discovery, speaking with Petitioner and Burton, and investigating Limbaugh's background. (Id. at 6-7, 13.) Burton, who had become a client of his after the incident, had not seen the shooting.[5] (Id. at 10.) After Petitioner changed his plea, she told Edmundson that she had tried to keep Limbaugh in the house. (Id. at 12.) This was consistent with what Petitioner had told him. (Id.) Moreover, regardless of whether Limbaugh charged Petitioner, he "had at least passed [Petitioner] in route to his vehicle at the time he was shot." (Id.) Still, if the case had gone to trial, Edmundson would have tried to portray Limbaugh as the aggressor. (Id. at 9.) Petitioner had told him that he did not remember pulling the trigger. (Id. at 17.) When asked if Limbaugh had come at him and swung at him, Petitioner had replied in the negative. (Id. at 18.) He had discussed with Petitioner the elements of second degree murder and the differences between first and second degree murder. (Id. at 18-20.) Asked if he was aware that the amended information did not

---

[4]The delay was occasioned by the appellate court recalling its mandate in Petitioner's direct criminal appeal.

[5]Edmundson also testified that Burton had died in a car accident four months earlier.

track the statutory offense of second degree murder, Edmundson testified that he was given the amended information that morning. (<u>Id.</u> at 24-25.) Regardless, the charge of second degree murder instead of first degree was a "gift." (<u>Id.</u> at 25.) He has since looked into the change and thinks the amended information was sufficient. (<u>Id.</u>) Edmundson further testified that Judge Price had later told him that he had not planned on giving Petitioner the harsh sentence he had, but Petitioner had "showed absolutely no remorse." (<u>Id.</u> at 24.) Edmundson thought that the prosecutor had violated the plea agreement by making statements in rebuttal to Edmundson's remarks. (<u>Id.</u> at 22-23.)

Thomas Menley and Charles Brotherton each testified about Limbaugh's reputation for drinking and being a bully and troublemaker. (<u>Id.</u> at 27, 30.) Neither had been contacted to testify on Petitioner's behalf. (<u>Id.</u> at 28, 31.)

Petitioner again testified. (<u>Id.</u> at 32-45.) Edmundson had never asked him what had happened that night; and, when he tried to tell him, Edmundson made fun of him. (<u>Id.</u> at 33.) He told Edmundson that he had not intended to fire his weapon, it was a reflex. (<u>Id.</u> at 34.) The morning he thought he was going to trial he argued with Edmundson about changing his plea; Edmundson had insisted that he do so. (<u>Id.</u> at 35.) Edmundson had not told him he had a potential defense of the cause of Limbaugh's death being the motor vehicle accident, not the gunshot wound. (<u>Id.</u> at 37.) If Edmundson had deposed Burton, who had given inconsistent statements, or had gone over the elements of second degree murder with him, he would have insisted on going to trial. (<u>Id.</u> at 41, 42.) Also, he had talked with

Edmundson about inconsistencies in the PSI, e.g., the report he was a "lousy employee" although his employee evaluation for the relevant period was meets or exceeds expectations,[6] but Edmundson said he did not think they were important. (Id. at 44-45.) Consequently, Judge Price had made his sentencing decision based on an incorrect PSI report. (Id. at 45.)

Several exhibits offered by Petitioner were admitted into evidence. (Resp. Ex. T.) These include the deposition of Edmundson taken early in the post-conviction proceedings when he was unavailable. Edmundson testified he did not recall telling Petitioner that "standing silent" would mean that the prosecutor would be mute and that he understood the term to mean that the prosecutor would not make a sentencing recommendation. (Id. No. 5 at 9.) He expected Petitioner to get a "fairly good probation report," but he got a "dismal one." (Id. at 12.) He never told Petitioner he could expect to serve three to four years or that he would get out early due to his medical issues. (Id. at 13-14.) He told Petitioner he expected him to get more than the minimum sentence; however, he did not expect it to be as severe as it was. (Id. at 12.)

The March 25, 2002, letter from Edmundson to Petitioner, see pages 5 to 6, supra, was admitted into evidence. (Id. Ex. 1.)

Limbaugh's autopsy and toxicology reports were also admitted into evidence. (Id. No. 3.) The autopsy was conducted by Dr. Deidiker. (Id.) His findings include a gunshot wound to the posterior right back. (Id. at 2.) "[T]he bullet perforated the posterior right ninth rib,

---

[6]See Petitioner's Exhibit O.

then perforated the liver, and posterior wall of the stomach, before exiting the anterior left chest wall, 8 inches directly to the left of the entrance wound." (Id.) No bullet was recovered. (Id.) There were additional injuries, including lacerations to his head, multiple rib fractures, abrasions, lacerations and contusions on his hands, and a subscalpular hemorrhage. (Id. at 3.) Dr. Deidiker opined that Limbaugh "died as a result of a gunshot wound of the chest and abdomen, combined with multiple injuries of the chest and abdomen." (Id. at 7.) He was shot once in the back; the bullet perforated the liver and stomach and then exited the chest and abdomen. (Id.) Dr. Deidiker found no evidence of close range fire. (Id.) After being shot, Limbaugh was in a motor vehicle accident and "sustained multiple internal injuries, including contusions of the lungs and heart, a lacerated spleen and mesentery [a fold of membrane connecting the bowel to the abdominal cavity[7]], multiple rib fractures, and a fracture of the right lower leg." (Id.) His manner of death was homicide. (Id.) The toxicology report revealed .130 gm% of ethanol in Limbaugh's blood. (Id. at [8].) There were no drugs. (Id.)

Also included in the admitted exhibits were depositions of Verlon Phillips and Burton taken in Phillips v. Langan, Case No. 4:03cv1320 AGF (E.D. Mo. 2005), and an affidavit by Anthony Williams describing Limbaugh as a bully. (Exs. 4-6.)

---

[7] See Mesenteric lymphadenitis, http://www.mayoclinic.org/diseases-conditions/mesenteric-lymphadenitis/basics/definition/con-20029694 (last visited Sept. 9, 2014).

The court denied Petitioner's motion, finding his claims lacked support in the transcript of the plea hearing and in the testimony of Petitioner. (Resp. Ex. S at 35-37.)

Petitioner appealed. (Id. at 39-40.) First, he argued that the motion court had erred by not finding he was denied due process in that the trial court had accepted his plea of guilty without a factual basis for second degree murder having been demonstrated. (Resp. Ex. U at 13.) The alleged facts did not establish that he had acted knowingly in causing Limbaugh's death. (Id.) Second, the motion court had erred by not finding that he was denied the effective assistance of counsel by counsel's failure to conduct an adequate investigation, leaving Petitioner no choice but to plead guilty. (Id. at 15.) Had counsel investigated, he would have recognized that Petitioner had a viable self-defense case. (Id.)

In an unpublished, April 2009 per curiam opinion, the appellate court affirmed the motion court. (Resp. Ex. W.) In an accompanying memorandum, the court noted the following.

> [After being read Count I,] [Petitioner's] only correction was the date of October 8, 2000 when [Limbaugh] died; [Petitioner] indicated [Limbaugh] died October 9, 2000, the day after he was shot. Aside from that discrepancy, [Petitioner] admitted to the allegations in Counts I and II. [Petitioner] stated that he had had time to go over it with Edmundson. [Petitioner] also indicated he was satisfied with his representation by Edmundson, and that [Petitioner] discussed all of his legal rights in the defense of his case with Edmundson. Later, Edmundson also told the court that he had discussed all of [Petitioner's] legal rights in the defense of his case with him before his plea.
>
> [The appellate court then quoted the prosecutor's transcribed statement of what he expected the evidence to show.]

[Petitioner] admitted that the prosecutor's statement could be what the State's evidence would be. [Petitioner's] only change in the recited facts was that he did not believe [Burton] actually saw [Limbaugh] leave the scene and that [Limbaugh] started the altercation. However, [Petitioner] did not dispute the prosecutor's statement of the evidence and acknowledged that he was "freely and voluntarily entering a plea of guilty to Counts I and II . . . ."

(Id. at 3-4; last alteration in original.)

Addressing Petitioner's first ground, the court disagreed that the facts recited at the change of plea hearing did not establish that he had "'knowingly'" caused Limbaugh's death. (Id. at 7.) The court noted that in the direct criminal appeal it had determined that the language of the amended information that Petitioner "'intentionally, premeditatedly, with malice aforethought and unlawfully caused the death of Wayne G. Limbaugh, by shooting him,'" "actually encompasses the mental state of 'knowingly.'" (Id. at 8.) Moreover, any doubt about the charge was removed by the information's reference to the charging statute. (Id. at 9.) "[Petitioner] never claimed to not understand the words, 'intentionally,' premeditatedly,' or 'with malice aforethought.'"[8] (Id.)

Addressing Petitioner's second ground, the court found that (a) Edmundson's investigation was adequate given that Plaintiff would not have been entitled to a self-defense instruction and (b) Petitioner's claim that Edmundson did not investigate Limbaugh's reputation and background was contrary to the evidence, i.e., Edmundson's testimony that his investigator did a background check on Limbaugh and that Limbaugh had a fairly good reputation early in life but later had "'become somewhat of a rounder." (Id. at 10.) Also,

_____

[8]The Court notes that Petitioner is a college graduate. (See Resp. Ex. M at 28.)

Edmundson had testified that he had discussed the possibility of a self-defense claim with Petitioner, but the facts did not support it, including the fact that Petitioner had told him that Limbaugh was not the initial aggressor. (Id. at 11.) And, Limbaugh had been shot in the back. (Id.)

Other Proceedings. In addition to pursuing a direct criminal appeal, post-conviction relief, and DNA testing, Petitioner filed civil claims against Edmundson and against two St. Louis police officers and two federal police officers.

Petitioner filed a fee dispute with the Missouri Bar. (Pet'r Ex. 9, ECF No. 37.) Edmundson declined to participate. (Id. at [3]; Pet'r Ex. 51, ECF No. 37.) He wrote the Fee Dispute Resolution Committee that he had argued for a lesser sentence for Petitioner but the argument was unavailing given the finding in the PSI report that Petitioner had refused to show remorse "despite the fact that [Limbaugh] was shot in the back" (Pet'r Ex. 51 at 1.) Edmundson explained that he did not feel mediation would be helpful because Petitioner wanted a full refund of all monies he had paid Edmundson. (Id. at 2.) Finding that nothing in the record indicated that Edmundson had done "anything other than broker a deal between the State and his client," the arbitrator ruled that Edmundson should refund to Petitioner $25,000 of the $42,200 paid him. (Pet'r Ex. 9 at [4].)

Nineteen months later, Petitioner filed a two-count pro se petition against Edmundson and other lawyers in his practice in the Circuit Court of Butler County. (Pet'r Ex. 13, ECF No. 37.) One count was for legal malpractice; one count was for fraud. (Id.) The latter

count was based on allegations that Edmundson had falsely represented to Petitioner that he had never lost a capital murder case, thereby inducing Petitioner to retain and pay him. (Id.)

One of the questions Petitioner asked Edmundson in his interrogatories was why he had hired the Limbaugh law firm to represent him "when in fact you knew that one of the Limbaugh family and/or representatives was at the sentencing of [Petitioner] making sure that [Petitioner] received life, and in fact it is believed actually went into the judges [sic] chambers to accomplish that mission." (Pet'r Ex. 10 at 2, ECF No. 37.) Edmundson responded that he hired Curt Poore, who happened to be a member of the Limbaugh law firm at the time, and that "[n]o member of the Limbaugh family or firm came into the Judge's chambers at the time of sentencing while [he] was present."[9] (Id.) Asked what he had done to determine Limbaugh's cause of death, Edmundson replied that "[w]e carefully examined all of the medical records. It was clear to me that he would have survived the automobile accident were it not for the gunshot wound. We did not have an expert opinion in that regard." (Id. at 4.) Edmundson later responded that he believed "the biggest factor in [Petitioner] not getting a lesser sentence was a complete failure to show any remorse." (Id. at 6.)

---

[9]Petitioner's exhibits include an affidavit by Stephen N. Limbaugh, Sr., now retired United States District Court Judge for the Eastern District of Missouri, and by Stephen N. Limbaugh, Jr., United States District Court Judge for the Eastern District of Missouri. (Pet'r Ex. 42.) Each avers that he is "only very distantly related to Wayne Limbaugh" and that "[t]he relationship is so distant that [they] have never met Wayne Limbaugh." (Id. ¶ 2.) Neither had any contact with Wayne Limbaugh's family, any representative of the prosecutor's office, Judge Price, or Edmundson about Wayne Limbaugh, Petitioner, or any sentence that Petitioner should receive. (Id. ¶ 3.) Neither was present at Petitioner's sentencing. (Id. ¶ 4.)

In October 2008, on the stipulation of the parties, with Verlon Phillips acting on behalf of Petitioner, the case was dismissed with prejudice at the defendants' costs.[10] (Pet'r Ex. 44.)

While Petitioner's direct criminal appeal was pending, he filed an action in this District against two St. Louis police officer and two federal police officers employed by the Department of Veterans Affairs. The complaint, amended by appointed counsel, alleged that (1) the four officers used excessive force when restraining Plaintiff at the VA St. Louis Hospital on October 9, 2000, in violation of his constitutional rights, and (2) the St. Louis police officers committed assault and battery when doing so, in violation of state law. See Phillips v. Langan, Case No. 4:03cv1320 AGF (E.D. Mo. Oct. 5, 2005). Depositions of Burton and Verlon Phillips were taken in the case. (Pet'r Exs. 30 and 31.)

Verlon testified that Edmundson had told him that Petitioner was looking at a ten-year sentence after the charge was reduced to second degree murder. (Pet'r Ex. 30 at 44.) He understood Edmundson to mean that he was hoping for a ten-year sentence; he was not guaranteeing it. (Id. at 46-47.) Petitioner was not dissatisfied with Edmundson's representation until after he was sentenced. (Id. at 51.)

---

[10]The suit had initially been dismissed without prejudice by the trial court on the grounds that Petitioner had failed to request the appointment of a trustee so that the action could be brought in the trustee's name. See Phillips v. Edmundson, 240 S.W.3d 691, 692 (Mo. 2007) (en banc). The supreme court held that such appointment was not mandatory and remanded the case. Id. at 692-93. The Missouri Attorney General filed an amicus curiae brief on behalf of Petitioner. See Id. at 692. Because of this, Petitioner argues that the Missouri Attorney General has a conflict of interest in now representing Respondent. This argument is without merit.

In her deposition, Burton described the events of October 8, 2000, and hers and Petitioner's subsequent drive and arrival at the VA St. Louis Hospital. (Pet'r Ex. 31.) She testified that when Petitioner arrived at her house for the second time that night, he stayed on the front porch and did not come in; the door was locked. (Id. at 20-21.) She saw Petitioner hit Limbaugh in the face. (Id. at 22.) Limbaugh did not raise his hand; he stepped back. (Id.) She went to get the telephone and did not see what happened next. (Id. at 21-22, 32.) She heard a gunshot and then Petitioner came in the house, grabbed her shoulders, and threatened to shoot her. (Id. at 21, 76.)

The case settled in July 2006.

Report of Harry J. Bonnell, M.D. At Petitioner's request, Dr. Bonnell, a forensic pathologist consultant, reviewed Limbaugh's autopsy report, the toxicology report, and the report of the emergency medical technicians ("EMTs") who responded to the motor vehicle accident scene. (Pet'r Exs. 1-3, ECF No. 37.)

The EMT report noted that Limbaugh was found lying on the ground away from his truck, which was "head on into tree" and extensively damaged in the front. (Pet'r Ex. 3 at [1].) When asked where he hurt, Limbaugh replied that he had been shot in the back. (Id. at [2].) He was described as being cool, clammy, pale, and "very combative." (Id.) When placed in the ambulance, he became "very combative" and would not cooperate when asked to lie down. (Id.) The EMT attempted to talk Limbaugh into letting him help him, but

Limbaugh would only say that he was dying and wanted to be let to die.  (Id. at [4].)  Because he was being combative, Limbaugh's vital signs could not be obtained.  (Id.)

In October 2009, Dr. Bonnell wrote Petitioner that the autopsy report included inaccuracies and did "not describe the internal injuries very well." (Pet'r Ex. 1 at 1.)  In his letter and accompanying declaration, he concluded, inter alia, that Limbaugh's clothing should have been tested for gunshot residue because "the absence of fouling or stippling on the skin means nothing if there was clothing covering the entrance wound"; "the liver injury could not have been very significant because [Limbaugh] survived at least one hour with the pre-existing liver injury"; and "the crash injuries . . . would have caused much more bleeding than the liver injury." (Id. at 1, 8.)  Dr. Bonnell concluded that, because Limbaugh "was obviously alert and combative after the car accident," "the gunshot wound did not cause the crash or contribute to it; the alcohol did." (Id.)  He opined that the gunshot wound did not cause Limbaugh's death, "although it may be considered a contributing factor." (Id. at 2, 9.)

Habeas Proceedings.  In his initial petition, filed after his pro se direct criminal appeal, Petitioner argues that his confinement violates due process because there was a "lack of judicial neutrality" and "overall 'scandalous' governmental conduct."  In support, Petitioner alleges that he has PTSD from his service in Vietnam.  On October 8, 2000, he was "accosted by an intoxicated Wayne G. Limbaugh, who was by nature, larger, stronger, and younger than the 55-year old [P]etitioner." (Pet'n at 3, ECF No. 1.)  "Limbaugh later succumb[ed] from the single gun shot wound inflicted by the [P]etitioner that entered the lower right side of the

rear shoulder area, and exited just below the nipple of the left side chest." (Id.) Because of his PTSD, Petitioner "very well may have *reasonably believed* that [h]e was subject to *serious physical injury* at the hands of [Limbaugh], based on verbal threat and the degree of assault raised against him." (Pet'n Suggs. at 1, ECF No. 1-1.) (First alteration in original.) Because Limbaugh was related to Stephen N. Limbaugh, Sr., Stephen N. Limbaugh, Jr., and Rush Limbaugh, his family's influence was such that Petitioner faced a "vigilante death sentence" and pled guilty only because he did not want to die. (Id. at 2.) The Limbaugh family's influence was reflected in an occurrence witnessed by two people. (Id.) A man who had "inferably met" with Judge Price approached members of the Limbaugh family and reassured them that Petitioner "would meet a 'predetermined' outcome."[11] (Id.) Also, Judge Price had refused to allow him to challenge the prosecutor's "erroneous statement of evidence." (Id. at 3.)

After pursuing his available state remedies, Petitioner filed a request to "supplement" his petition to add four grounds for relief. (Pet'r Mot. at 17-39, ECF No. 40.) The claims are (1) his continued confinement violates the United States Constitution and the Missouri Bill of Rights because he is factually innocent (a) as shown by Dr. Bonnell's report and (b) because he did not intentionally shoot Limbaugh; (2) he was denied due process and equal protection when the State suppressed evidence of his legal and factual innocence, including

_____

[11]In support of this allegation, Petitioner later submits the identical affidavits of Verlon Phillips and Julie Matheny attesting that they saw a man in a dark suit come out of a room "next to the Judge's stand" after the sentencing and tell the Limbaugh family, "I told you how it was going to turn out, didn't I." (Pet'r Ex. 43, ECF No. 37.)

Dr. Bonnell's findings, and of Limbaugh's violent reputation; (3) he was denied his constitutional rights to (a) meaningful notice of the charges against him, (b) to be tried by a court with jurisdiction, (c) not to be prosecuted for violating a repealed statute, and (d) not to have the State change its prosecution theories from court to court; and (4) he was denied the effective assistance of trial counsel when (a) counsel failed to consult any experts and acted instead as a medical expert, (b) did not investigate Limbaugh's reputation as a violent person and bully, (c) gave a perjured statement that Limbaugh was going to his vehicle when shot, such being physically impossible because a bullet was recovered from the front door of the house,[12] (d) allowed the prosecutor to charge Petitioner under a repealed statute, (e) failed to inform Petitioner that he could not be guilty of second degree murder if he did not remember firing the gun, (f) failed to investigate or consult any experts and failed to file any pretrial motions, (g) misled him into pleading guilty by saying that the prosecutor would "stand silent" at the sentencing hearing, (h) failed to require that the trial court comply with state law mandating that there be a factual basis for a guilty plea, (i) not taking any depositions, including that of Burton, (j) used false pretenses to convince Petitioner to retain him, and (k) failed to effectively plea bargain.  (Id.)

Attached to Petitioner's request is a motion for the appointment of counsel and for an evidentiary hearing.  Petitioner has also moved to strike the State's response to a show cause order; for a hearing on the question of influence by the Limbaugh family on Judge Price; for

---

[12]See Missouri Highway Patrol property record of October 9, 2000, listing "screen door to residence with bullet present in door."  (Pet'r Ex. 37, ECF No. 37.)

a hearing on the question of the cause of death of Limbaugh; for admission of the affidavits of Dr. Bonnell, Anthony Williams, and Darlene Chambers[13]; for leave to file an amended traverse to correct errors in case citations; for leave to proceed with discovery; and for the Court to consider a newspaper article about the Supreme Court's decision in Lafler v. Cooper, 132 S.Ct. 1376 (2012) (finding that a defendant had established ineffective assistance of counsel when rejecting a plea offer on the advice of counsel).

## Discussion

Standard of Review.  "Under 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), a decision by a state court 'with respect to any claim that was adjudicated on the merits in State court proceedings' is entitled to deference by the federal courts.  '[W]hen a state prisoner files a petition for a writ of habeas corpus in federal court [the Court] is directed to undertake only a limited and deferential review of underlying state court decisions.'"  **Worthington v. Roper**, 631 F.3d 487, 495 (8th Cir. 2011) (quoting Collier v. Norris, 485 F.3d 415, 421 (8th Cir. 2007)) (first alteration in original).  The "AEDPA instructs that habeas relief cannot be granted 'unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'resulted in a decision that was based on an unreasonable determination of

---

[13]Darlene Chambers avers that, although she did not know Limbaugh, she had talked to people about him and they had told her he was very aggressive, drank a lot, and had been barred from a lot of clubs because of fighting.  (Pet'r Ex. 24, Ex. 37.)

the facts in light of the evidence presented in the State court proceeding.'" **Id.** (quoting 28

U.S.C. § 2254(d)) (alteration in original). "A state court decision is 'contrary to' clearly

established federal law if it either 'arrives at a conclusion opposite that reached by [the

Supreme] Court on a question of law' or 'decides a case differently than th[e] [Supreme]

Court has on a set of materially indistinguishable facts.'" **Id.** (quoting <u>Williams v. Taylor</u>,

529 U.S. 362, 412–13 (2000)) (alterations in original). "A state court 'unreasonably applies'

Supreme Court precedent if it 'identifies the correct governing legal principle from th[e]

[Supreme] Court's decisions but unreasonably applies that principle to the facts of the

prisoner's case.'" **Id.** (quoting <u>Williams</u>, 529 U.S. at 413) (alterations in original). "'A

federal court may not issue the writ simply because it 'concludes in its independent judgment

that the relevant state-court decision applied clearly established federal law erroneously or

incorrectly. Rather, that application must also be unreasonable.'" **Id.** (quoting <u>Lyons v.</u>

<u>Luebbers</u>, 403 F.3d 585, 592 (8th Cir. 2005)). Additionally, "[t]he Supreme Court has noted

that if the AEDPA standard is 'difficult to meet, that is because it was meant to be.'"

**Armstrong v. Hobbs**, 698 F.3d 1063, 1066 (8th Cir. 2012) (quoting <u>Harrington v. Richter</u>,

562 U.S. 86, — , 131 S.Ct. 770, 786 (2011)).

    Not all of Petitioner's proffered grounds were fairly presented to the state courts. For

instance, he now raises eleven different arguments in support of his claim of ineffective

assistance of counsel, but not all were raised in his appeal from the denial of his post-

conviction motion. <u>See</u> **Baldwin v. Reese**, 541 U.S. 27, 29 (2004) (holding that 28 U.S.C.

§ 2254(b)(1) requires that a state prisoner give the State the "opportunity to pass upon anc correct alleged violations of [his] federal rights" by "fairly present[ing] his claim in each appropriate state court") (internal quotations omitted). However, because Petitioner's path through the state courts was long and complicated and because his claims may be more easily resolved on their merits than on the issue of procedural default, see **Dodge v. Robinson**, 625 F.3d 1014, 1017 n.1 (8th Cir. 2010), **Barrett v. Acevedo**, 169 F.3d 1155, 1162 (8th Cir. 1999), the Court will address the merits below regardless of whether they have been so defaulted. For ease of reference, the Court will address Petitioner's claims of ineffective assistance of counsel first because they involve factual allegations that also form the bases for his first three grounds for relief.

Ineffective Assistance of Counsel. In his proposed supplemental petition, Petitioner raises eleven claims of ineffective assistance of trial counsel: counsel (1) failed to consult any experts and acted instead as a medical expert; (2) did not investigate Limbaugh's reputation as a violent person and bully; (3) gave a perjured statement that Limbaugh was going to his vehicle when shot, such being physically impossible because a bullet was recovered from the front door of the house; (4) allowed the prosecutor to charge Petitioner under a repealed statute; (5) failed to inform Petitioner that he could not be guilty of second degree murder if he did not remember firing the gun; (6) failed to investigate or consult any experts and failed to file any pretrial motions; (7) misled him into pleading guilty by saying that the prosecutor would "stand silent" at the sentencing hearing; (8) failed to require that

the trial court comply with state law mandating that there be a factual basis for a guilty plea; (9) failed to take any depositions, including that of Burton; (10) used false pretenses to convince Petitioner to retain him; and (11) failed to effectively plea bargain.

"Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." **Lafler**, 132 S.Ct. at 1384. Under the standards set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), "a defendant alleging a violation of the Sixth Amendment right to counsel must show both that counsel's performance was deficient and that the deficiency prejudiced the defendant." **Williams v. Roper**, 695 F.3d 825, 830 (8th Cir. 2012). If the defendant has entered a guilty plea, to prevail on his Sixth Amendment claim, "[he] must demonstrate a reasonable probability that 'but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" **Ward v. Hobbs**, 738 F.3d 915, 917 (8th Cir. 2013) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)); accord **Premo v. Moore**, 131 S. Ct. 733, 743 (2011). See also **Barnes v. Hammer**, — F.3d — , 2014 WL 4197486, *2 (8th Cir. 2014) ("In the plea negotiation context, in order to establish prejudice, a petitioner must show that the outcome of the plea process would have been different had competent counsel represented him during the pea process.") (citing Lafler, 132 S.Ct. at 1384). This Court's review of the state courts's decisions is "'doubly deferential'" – the Court "take[s] a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'" **Cullen v. Pinholster**, 131 S.Ct.

1388, 1403 (2011) (quoting, in order, <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009); <u>Strickland</u>, 466 U.S. at 689, and <u>Mirzayance</u>, 556 U.S. at 121 n.2).

With this "doubly deferential" standard in mind, the Court turns to Petitioner's specific claims of ineffective assistance of counsel.

Petitioner first argues that Edmundson failed to consult any experts, acting instead as a medical expert himself. It is undisputed that Edmundson did not consult any experts. He had the autopsy and toxicology reports and, according to his answer to an interrogatory asking what he had done to determine Limbaugh's cause of death, had examined all the medical records. He had also answered that, "It was clear to me that [Limbaugh] would have survived the automobile accident were it not for the gunshot wound." (Pet'r Ex. 10 at 4.) Citing Dr. Bonnell's report, Petitioner contends that the autopsy report finding the cause of death to be the gunshot wound is wrong and that, had Edmundson done any related investigation, Petitioner would not have pled guilty to a second degree murder charge based on the accidental death of Limbaugh.

It is undisputed that Petitioner, and only Petitioner, shot Limbaugh. He told the forensic examiner in May 2001 that he was not sure he would be found guilty of the first degree murder of Limbaugh because he did not know if the motor vehicle accident was the cause of death. Even so, eleven months later, he stated, under oath, that Edmundson had not failed to do anything Petitioner had requested and that, with irrelevant two exceptions, he

agreed with the prosecutor's statement that the evidence would show that the gunshot wound was fatal.

In **<u>Wilcox v. Hopkins</u>**, 249 F.3d 720 (8th Cir. 2001), the habeas petitioner argued that his trial counsel were ineffective in persuading him to plead guilty to two counts of second degree murder before a requested ballistic analysis of the crime scene had been performed. At the first change of plea hearing, the petitioner had disagreed with the prosecutor's statement of what the evidence would be and had stated allegations which, if true, gave rise to a defense of self-defense. **<u>Id.</u>** at 723. After informing the petitioner of the potential defense, the court inquired if he still wished to proceed. **<u>Id.</u>** He did. **<u>Id.</u>** The court accepted his plea, but agreed to give him an opportunity before sentencing to make a statement. **<u>Id.</u>** The petitioner made a statement then, including a complaint about trial counsel, but did not move to withdraw his plea. **<u>Id.</u>** Addressing his ineffective assistance of counsel claim, the Eighth Circuit concluded he had failed to show prejudice, noting that the petitioner knew when he changed his plea that a defense expert had been retained but had proceeded regardless. **<u>Id.</u>** The court also noted that the ballistics report was inconclusive and that the petitioner had not moved to withdraw his plea. **<u>Id.</u>** In light of these considerations, the petitioner's current claim that he would not have pled guilty had his trial counsel earlier provided a ballistics report was found not to be credible. **<u>Id.</u>**

Similarly, at least by May 2001, Petitioner was of the opinion that the gunshot wound might not have killed Limbaugh. When questioned about the accuracy of the prosecutor's

summary of the evidence, however, he disputed only the day of Limbaugh's death and not the manner. Nor did he cite Edmundson's failure to consult an expert when asked if his trial counsel had done everything Petitioner had asked. "'[A] defendant's representations during the plea-taking carry a strong presumption of verity and pose a formidable barrier in any subsequent collateral proceedings.'" **Nguyen v. United States**, 114 F.3d 699, 703 (8th Cir. 1997) (quoting <u>Voytik v. United States</u>, 778 F.2d 1306, 1308 (8th Cir. 1985)). Petitioner has failed to overcome that barrier on his first claim of ineffective assistance of counsel.

Petitioner next argues that Edmundson was ineffective for not investigating Limbaugh's reputation for being a violent person and bully. Edmundson testified at the second post-conviction hearing that he had hired an investigator and had learned that Limbaugh's recent reputation was for being "somewhat of a rounder." (Resp. Ex. W at 10.) The motion court rejected Petitioner's claim that Edmundson had not investigated Limbaugh. In addressing the question of Edmundson's investigation of Limbaugh in Petitioner's post-conviction appeal, the court found it "apparent the motion court simply believed Edmundson and disbelieved [Petitioner]." (Pet'r Ex. 19 at 12.) This implicit credibility finding is presumed to be correct. <u>See</u> **Smulls v. Roper**, 535 F.3d 853, 861 (8th Cir. 2008) (en banc) (noting that the state court's failure to make explicit findings does not relieve the federal court "of its obligation to view the state trial court's findings as presumptively correct" and that deference to a state court's findings of fact includes its credibility determinations); **Grass v. Reitz**, 749 F.3d 738, 743 (8th Cir. 2014) ("The presumption of correctness applies not only

to express findings of the state court but also to implicit findings").  Attempting to rebut the presumption, Petitioner notes that, when responding to his request in the malpractice action that Edmundson produce notes and reports made in his investigation of Limbaugh's reputation, Edmundson stated that he spoke to a number of people about Limbaugh but did not take notes.  (Pet'r Ex. 11 at 3.)  The lack of a written record of an investigation does not establish the absence of oral reports about Limbaugh's reputation.  Petitioner also cites Edmundson's statement that Limbaugh had attended a state college as evidence of Edmundson's untruthfulness.  In so doing, he ignores Edmundson's reference in his response to the production request that he had turned over Limbaugh's college record to Petitioner.  (Id.)  Instead, Petitioner relies on an absence of any reference to Limbaugh attending college in an article about Limbaugh being inducted into the Southeast Missouri Baseball Hall of Fame.  (See Resp. Ex. C at 164-67.)  That article, however, focuses on Limbaugh's baseball career.  (Id. at 166-67.)  The only references to schools are to the high school where Limbaugh was on a baseball team that finished second in the state and to the junior college where Limbaugh was sent by a major league scout to play baseball.  (Id. at 167.)  Petitioner has failed to offer the clear and convincing evidence necessary to rebut the presumption that the state court's findings as to trial counsel's investigation of Limbaugh.  See 28 U.S.C. § 2254(e)(1).

Edmundson also perjured himself, Petitioner argues, when he stated that Limbaugh was going to his truck when shot.  The perjury is allegedly revealed by the bullet found in

the front door of the house; in other words, if Limbaugh was going to his vehicle when shot, his vehicle would have to have been in the house. The Court notes that the cited testimony was given at the second post-conviction evidentiary hearing. Moreover, Petitioner has failed to establish that the testimony was perjured because the record includes (a) Petitioner's statements *prior* to sentencing that Limbaugh was turning when he shot him and (b) Petitioner's and Burton's statements that Petitioner fired his gun when inside the house and missed the intended targets.

Petitioner argues that Edmundson was ineffective for allowing him to be charged under a repealed statute. As twice noted by the state appellate court, the statute, Mo.Rev.Stat. § 565.021 is still in effect. What changed are the adjectives. The amended information charged Petitioner with "intentionally, premeditatedly, with malice aforethought and unlawfully causing" Limbaugh's death. Phillips, 204 S.W.3d at 730-31. The statute in effect defines second degree murder as "[k]nowingly caus[ing] the death of another person . . . ." Mo.Rev.Stat. § 565.021.1(1).[14] The Missouri Court of Appeals rejected on direct appeal Petitioner's argument that he had been "'charged under a statue that no longer exists.'" Phillips, 204 S.W.3d at 732. And, Edmundson testified that, although he was unaware at the time of the change of plea hearing that the amended information did not track the language

---

[14]It also, as did the previous version, includes in the definition of second degree murder (i) causing the death of a person when purposefully causing serious physical injury to another person or (ii) when a person is killed when the defendant is committing or attempting to commit a felony or is in immediate flight from such perpetration or attempted perpetration. Mo.Rev.Stat. § 565.021.1(1) and (2). These alternative criteria are not at issue in Petitioner's case.

of § 565.021, he had since looked into the differences and thought, as did the court of appeals, the amended information was sufficient and that the reduction of the charge to second degree murder was a gift. Petitioner makes much of the fact that Edmundson testified he did not receive a copy of the amended information until the morning of April 1, 2002. He had, however, written and spoken with Petitioner four days earlier about the prosecutor's offer of a reduction to second-degree murder and it was that reduction that was the focus of the plea negotiations. See **Nelson v. Hvass**, 392 F.3d 320, 324 (8th Cir. 2004) (finding that petitioner had failed to establish that, but for his counsel's alleged ineffectiveness, he would have insisted on a jury trial when the plea agreement secured for him a lesser charge with a reduced range of punishment).

In a related argument, Petitioner contends that trial counsel was ineffective for not telling him that he could not be found guilty of second degree murder if he did not remember firing the gun. In **State v. Stidman**, 259 S.W.3d 96, 100-01 (Mo.Ct.App. 2008), the court found that there was evidence to support a jury's finding of second degree murder. The defendant had fatally shot the unarmed deceased after finding him with his wife. **Id.** The two men had rushed at each other; the defendant had brought a gun to the scene; the gun was fired; and the shots killed the other man. **Id.** The defendant had testified at trial that he did not remember shooting the other man and had not intended to shoot or kill him. **Id.** at 103. "[E]ven in a homicide case, the circumstances need not be absolutely conclusive of guilt and they need not demonstrate the impossibility of [the defendant's] innocence; the mere

existence of other hypothesis is not enough to remove the case from the . . . trier of fact."

**State v. Clark**, 272 S.W.3d 432, 438 (Mo.Ct.App. 2008) (quotations omitted) (first and third alterations in original). There was evidence that Petitioner returned to his former girlfriend's house after earlier being told to leave; that he brought a gun with him; that Limbaugh was unarmed and did not strike Petitioner; that Petitioner did strike Limbaugh; that Limbaugh was shot in the back; and that Limbaugh died from the gunshot wound. Because any advice that Petitioner could not be found guilty of second degree murder if he did not remember pulling the trigger would have been erroneous, Petitioner's underlying claim of ineffective assistance of counsel is without merit.[15]  See **Gray v. Bowersox**, 281 F.3d 749, 756 n.3 (8th Cir. 2002).

In his sixth claim of ineffective assistance of trial court, Petitioner argues that counsel failed to investigate or consult any experts and to file any pretrial motions. Insofar as this claim involves Dr. Bonnell's report, it is addressed below. Insofar as it involves any other investigation or consultation, it is addressed above. Petitioner's first counsel filed a motion for a mental examination, a motion for a change of judge, and a motion for disclosure. Each was granted. Petitioner fails to describe any other pretrial motion that, had it been filed, he would have insisted on going to trial. Additionally, the arbitrator's opinion that Edmundson

_____

[15]Also, the evidence of whether Petitioner remembered pulling the trigger is not consistent. He told Dr. English that he pulled the trigger once and that he did not remember pulling the trigger. He testified at the post-conviction hearing that he fired the gun as a reflex.

should refund the majority of his retainer does not equate, as Petitioner argues, to a finding he was ineffective because of that failure.

Petitioner next argues that trial counsel misled him into pleading guilty by saying that the prosecutor would "stand silent" at the sentencing hearing. "Generally, when a defendant pleads to a charge in reliance on a promise or agreement by the prosecutor, that promise must be fulfilled or else the defendant may withdraw his plea." **Taylor v. Bowersox**, 329 F.3d 963, 968 (8th Cir. 2003). "The determination as to whether a prosecutor's statement violates a plea agreement is a conclusion of law." **Colvin v. Taylor**, 324 F.3d 583, 586 (8th Cir. 2003).

In **Colvin**, the habeas petitioner argued that the prosecutor had violated the plea agreement when he spoke at the sentencing hearing in response to the petitioner's request for immediate probation although he had agreed to "stand silent" in response to the petitioner's request to be sentenced to 120 days confinement followed by probation. **Id.** at 585. The state appellate and trial courts had concluded "that the prosecutor's comments were undertaken only to reply to and clarify defense counsel's factually incorrect assertions" about his client's maturation. **Id.** at 590. The Eighth Circuit held that this conclusion was entitled to substantial deference under the AEDPA and denied habeas relief. **Id.** at 591. In **Nelson**, 392 F.3d at 323-24, the Eighth Circuit rejected a habeas petitioner's ineffective assistance of counsel claim based on counsel allegedly misinforming him about the affect on his sentence of an agreement to waive a jury trial. The petitioner had been present when his attorneys and

the trial judge discussed the details of the agreement, including the lack of any deal as to his sentence and the judge's statement that his sentence was "up for grabs" should he be found guilty. **Id.** at 324. The court further held that any contradictory information received off the record by petitioner from his counsel did not negate what he had learned during that discussion. **Id.**

In the instant case, the prosecutor spoke in rebuttal to several representations made by Edmundson at the sentencing hearing, e.g., that Limbaugh was the aggressor, but did not speak in support of or against any sentence. Edmundson testified in his deposition that he never told Petitioner that to "stand silent" meant to say nothing at all. Indeed, Petitioner does not contend otherwise, but argues Edmundson should have told him that "standing silent" meant only that the prosecutor would not make a sentencing recommendation. Whatever Petitioner's interpretation of the meaning of "stand silent" was, he nonetheless stated under oath that there was no reason why sentence should not be pronounced *after* the prosecutor spoke. Petitioner attempted in the post-conviction proceedings to explain this inconsistency by stating that he had been lying or was "greatly mistaken" when testifying at the change of plea and sentencing hearings. The motion court implicitly rejected this attempt when finding that Petitioner's testimony failed to support his claim that Edmundson was ineffective for not explaining the term "stand silent." See **Grass**, 749 F.3d at 744 ("The circuit court's credibility determinations are owed the same deference as their factual findings . . . .") (citing Smulls, 535 F.3d at 854).

In his next, and eighth, claim, Petitioner argues that Edmundson was ineffective for not requiring that the trial court comply with state law requiring that there be a factual basis for the guilty plea. This claim is unavailing. The appellate court held that the facts alleged by the prosecutor were sufficient to support a conviction for second degree murder. "[T]rial counsel could not have been ineffective for failing to raise a state law claim with no merit." **Graves v. Ault**, 614 F.3d 501, 507 (8th Cir. 2010). See also **Gray v. Bowersox**, 281 F.3d 749, 756 n.3 (8th Cir. 2002) (noting that a claim of ineffective assistance of trial counsel for failure to object cannot succeed when the underlying objection would have been without merit).

Edmundson was also not ineffective for not taking any depositions. There were three people at the scene when Limbaugh was shot. One was Limbaugh; one was Petitioner. Petitioner focuses his argument on the third person, Burton. Petitioner attributes a self-serving motive to Edmundson's failure to take Burton's deposition, arguing that Burton would not have later retained him to represent her had he taken her deposition and caught her in a lie. "[T]he Supreme Court has held that 'a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to show relief.'" **Dansby v. Hobbs**, No. 10-1990, slip op. at 41 (8th Cir. Sept. 5, 2014) (quoting Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980)). Petitioner has not made the necessary showing. There is nothing in the record to suggest that Edmundson could have foreseen that Burton would later hire him. And, there is nothing to suggest that, had her

deposition been taken, Petitioner would have insisted on going to trial. Burton's deposition was later taken pursuant to a civil case Petitioner filed against four police officers. The deposition was admitted in Petitioner's post-conviction proceedings.[16] Nothing in the deposition contradicts the prosecutor's statement of the crime.[17]

Petitioner further argues that Edmundson was ineffective because he used false pretenses to convince Petitioner, who was detained pending trial, to retain him. The allegedly false pretenses include Edmundson's success rate in capital murder trials. Petitioner does not submit any evidence that the alleged success rate is false. An excellent success rate would be more likely to persuade Petitioner to go to trial, not to plead guilty. Petitioner, however, repeatedly explained in the post-conviction hearing that he said what was necessary in the change of plea and sentencing hearings to receive the plea bargain. His bare assertion now that he would not have pled guilty but for any alleged misrepresentation is unavailing. See **United States v. Frausto**, 754 F.3d 640, 644 (8th Cir. 2014).

---

[16]The Court notes that testimony in that deposition includes Burton's report that Petitioner told her not to stop when they saw the emergency lights at the accident scene and "that's that son of a bitch that ran into a tree. If he wasn't dead before, he is now." (Pet'r Ex. 31 at 80.) Such a report would have reinforced the judge's conclusion about Petitioner's lack of remorse.

[17]As an example of a lie by Burton, Petitioner contends that he first arrived at Burton's house after seven o'clock in the evening, not around six as she testified at the preliminary hearing. In support of this contention, Petitioner submits a photograph of Burton's answering machine showing a call by him to her at 7:15 pm. (Pet'r Ex. 40.) Even if evidence of a phone call was relevant to when Petitioner first *arrived* at Burton's house, it does not contradict Burton's evidence about the second time Petitioner came there and shot Limbaugh.

In his last claim of ineffective assistance of trial counsel, Petitioner alleges that Edmundson failed to effectively plea bargain. "In the plea negotiation context, in order to establish prejudice, a petitioner must show that the outcome of the plea process would have been different had competent counsel represented him during the plea process." **Barnes**, 2014 WL 4197486 at *2 (citing Lafler, 132 S.Ct. at 1384). To make this showing, Petitioner cites to two other cases in the same court in which the defendants, represented by a public defender, were charged with first degree murder and were able to plea bargain for a specific term of imprisonment. Plea agreements of other defendants in undefined situations does not establish that Edmundson did not effectively plea bargain. Moreover, Petitioner affirmed under oath that he understood that no sentencing recommendation had been made and that the sentence was within the judge's discretion.

Factual Innocence.  Petitioner contends that his continued confinement violates the United States Constitution[18] because he is factually innocent (a) as shown by Dr. Bonnell's report and (b) because he did not intentionally shoot Limbaugh.

The Eighth Circuit recently noted that

> [t]he Supreme Court has not decided whether a persuasive demonstration of actual innocence after trial would render unconstitutional a conviction and sentence that is otherwise free of constitutional error. The Court has established, however, that the threshold for any such claim, if it were recognized, would be "extraordinarily high." The threshold, if it exists, would require "more convincing proof" than the "gateway" standard that allows for

---

[18]Petitioner also argues that his confinement violates Missouri's Bill of Rights. This argument is not cognizable in a § 2254 proceedings. See **Nance v. Morris**, 392 F.3d 284, 289 (8th Cir. 2004).

consideration of otherwise defaulted constitutional claims upon a showing of actual innocence. Thus, on a freestanding claim of actual innocence, it is not sufficient that a petitioner shows even that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. The "extraordinarily high" threshold, if recognized, would be even higher.

**Dansby**, No. 10-1990, slip opinion at 6 (internal quotations and citations omitted).

The lesser actual innocence showing requires that the proffered evidence be "new reliable evidence which was not available at trial through the exercise of due diligence." **Kidd v. Norman**, 651 F.3d 947, 953 (8th Cir. 2011). Dr. Bonnell's report is not evidence that was formerly unavailable. Before changing his plea, Petitioner questioned whether he would be found guilty because of the possibility that Limbaugh had died as a result of the accident, not the gunshot wound. A failure to pursue an expert to support that alternative cause is not attributable to anything other than a lack of due diligence. See **Nooner v. Hobbs**, 689 F.3d 921, 934 (8th Cir. 2012) (rejecting claim that expert's report was new evidence when technique that was the foundation of the report could have been used prior to trial). Nor has Petitioner made a showing that Dr. Bonnell's report would cross the higher than "extraordinarily high" threshold. Dr. Bonnell did not do the autopsy on Limbaugh. Dr. Dr. Deidiker did, and concluded that Limbaugh died as a result of the gunshot wound.

The evidence is that Petitioner struck Limbaugh, who was not the aggressor, and shot him in the back. Petitioner's claim that he did not intentionally shoot Limbaugh is not new evidence.

Suppression of Favorable Evidence.  Petitioner argues he was denied due process and equal protection when the State suppressed evidence of his legal and factual innocence, including Dr. Bonnell's findings, and of Limbaugh's violent reputation.  "In Brady, th[e] [Supreme] Court held 'that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" **Strickler v. Greene**, 527 U.S. 263, 280 (1999) (quoting Brady v. Maryland, 373 U.S. 83, 87 (1963)).  This claim lacks factual support.  Dr. Bonnell issued his report seven years after Petitioner pled guilty and did so at the request of Petitioner.  And, there is nothing in the record to support Petitioner's allegation that the prosecutor had evidence of a violent reputation of Limbaugh.

Second Degree Murder Charges.  Petitioner next challenges the second degree murder charge, arguing that he was denied his constitutional rights (1) to meaningful notice of the charges against him, (2) to be tried by a court with jurisdiction, (3) not to be prosecuted for violating a repealed statute, and (4) not to have the State change its prosecution theories from court to court.  The essence of the first three charges is the inclusion in the amended information of language from a version of the second degree murder statute, Mo.Rev.Stat. § 565.021.1, that was not in effect at the time of the offense and plea.

"For a plea to be voluntary, a defendant must have knowledge of the law in relation to the facts." **Bailey v. Weber**, 295 F.3d 852, 855 (8th Cir. 2002).  Petitioner was advised

four days before trial that the prosecutor's only offer was to reduce the charge to second degree murder. This charge did not carry with it a potential death sentence. "The threat of a heavier sentence does not render a plea involuntary." **Wilcox v. Hopkins**, 249 F.3d 720, 724 (8th Cir. 2001). And, Petitioner repeatedly explained during the post-conviction evidentiary hearing that he gave the answers necessary to get the plea bargain. See **Williams v. Roper**, 695 F.3d at 833 (rejecting habeas petitioner's claim that relied on a jury finding him credible when he acknowledged that he had lied under oath in order to secure a favorable plea agreement).

Additionally, contrary to Petitioner's argument, he did not plead guilty to a repealed statute. As noted by the appellate court, the statute cited in the amended information was the correct second degree murder statute. The words describing the necessary intent for second degree murder were different from those in the statute, but did not change that intent. See **Phillips**, 204 S.W.3d at 731-32. In § 2254 proceedings, "[a] federal court may not re-examine a state court's interpretation and application of state law." **Schleeper v. Groose**, 36 F.3d 735, 737 (8th Cir. 1994).

Nor was Petitioner tried by a court without jurisdiction. Petitioner correctly notes that, under Missouri law, "[i]f an information is insufficient, the circuit court acquires no jurisdiction, and whatever transpires thereafter is a nullity." **State v. McKinzie**, 736 S.W.2d 571, 572 (Mo.Ct.App. 1987). The appellate court held the amended information was sufficient. On the other hand, "a plea of guilty to a charge does not waive a claim that –

*judged on its face* – the charge is one which the State may not constitutionally prosecute."

**Neely v. McDaniel**, 677 F.3d 346, 349 (8th Cir. 2012) (alteration in original) (internal quotations omitted). Judged on its face, the amended information is not unconstitutionally vague or overbroad.

Petitioner further argues that he was denied his constitutional rights when the state appellate court affirmed his conviction under a theory that was inconsistent with that used in the trial court. The state appellate court addressed and resolved Petitioner's claim that he was denied due process when the amended information was not dismissed on the grounds that it did not accurately include the necessary mental state for second degree murder. Petitioner cites to no Supreme Court case prohibiting a state appellate court from deciding an issue put before it on grounds different than those relied on by a trial court.

<u>Bias and Improper Interference.</u>. In his initial petition, Petitioner argued that there had been a "lack of judicial neutrality" and "overall 'scandalous' governmental conduct" because influential members of Limbaugh's family had influenced Judge Price, as evidenced by the man approaching the family after sentencing and reminding them that he had told them how that sentencing would turn out. Three people are cited as having this improper influence: Stephen N. Limbaugh, Sr.; Stephen N. Limbaugh, Jr.; and Rush Limbaugh. As noted above, see note 9, the two Stephen Limbaughs each aver that they are but distantly related to Wayne Limbaugh, had never met him, and had never spoken to anyone, including Judge Price or the

prosecutor, about any sentence for Petitioner.  There is no evidence that Rush Limbaugh, a radio show host, had any contact or influence either.

Miscellaneous Motions.  While Petitioner's first, pro se direct criminal appeal was pending, he filed this § 2254 action.  The action was then stayed while he exhausted his available state court remedies.  After those remedies had been exhausted, he filed a motion for leave to amend his petition to raise the grounds addressed above.  Included in this motion is a motion for appointment of counsel and for an evidentiary hearing.  Petitioner also filed two separate motions for an evidentiary hearing.  In the earlier of these, he requests a hearing on the question of the influence of three Limbaughs on his sentence.  In the second motion, he requests a hearing to adduce evidence from Dr. Bonnell, Anthony Williams, Darlene Chambers, and Verlon Phillips.

> Under 28 U.S.C. § 2254(e)(2), the court shall not hold an evidentiary hearing, unless the applicant shows that:
>
> (A) the claim relies on —
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

**White v. Dingle**, 757 F.3d 750, 757 (8th Cir. 2014). The proffered evidence has been discussed above; it does not satisfy any of § 2254(e)(2)'s criteria.

In his motion to amend the petition, Petitioner requests the appointment of counsel In deciding whether to appoint counsel, this Court considers "the factual and legal complexity of the case, and the petitioner's ability both to investigate and to articulate his claims without court appointed counsel." **Morris v. Dormire**, 217 F.3d 556, 558-59 (8th Cir. 2000) (internal quotations omitted). "[T]here is neither a constitutional nor statutory right to counsel in habeas proceedings." **Id.** at 558 (internal quotations omitted). Petitioner has pursued his claims pro se in a direct appeal, in a state court petition seeking DNA testing, and in initiating a motion for post-conviction relief and two civil lawsuits arising from the underlying criminal case. The record is fully developed; the legal issues are not complex or novel. His motion for appointment of counsel will be denied.

Petitioner moves to strike the State's response to the Court's show cause order. This motion will be denied. He also moves for the Court to "accept as true and proven" the affidavits of Dr. Bonnell, Anthony Williams, Darlene Chambers, and Verlon Phillips. These affidavits are already part of the record and have been considered as such. The Court will not grant Petitioner's motion asking for more than that.

Petitioner moves to amend his traverse and for the Court to consider an article about Lafler v. Cooper, supra. These motions will be granted.

Next, Petitioner moves for leave to proceed with discovery. The basis for this motion is his allegation that he just learned that Judge Seay had been disqualified from presiding over his criminal proceedings. Judge Seay had not been disqualified. Petitioner's first attorney, Mr. Rhodes, had taken a change of judge under Mo.S.Ct.R. 32.07(a). This rule allows for "a change of judge . . . upon the timely filing of a written application therefor by any party. *The applicant need not allege or prove any reasons for such change*." Id. (Emphasis added.) Additionally, Petitioner stated, under oath, that he had no objection to Judge Seay presiding over the post-conviction proceedings after a change of judge had been taken when he was initially designated to preside over the criminal proceedings.

## Conclusion

Petitioner was charged with first degree murder, the range of punishment for which included death. He was offered, and knowingly accepted and pled to, a charge of second degree murder with no sentencing recommendation by the prosecutor. He gambled on the judge giving him a light sentence, and lost. Whatever the infirmities of the state court proceedings and his trial counsel's representation were, there were no violations of his constitutional rights. Accordingly, after careful consideration of the entire record,

**IT IS HEREBY ORDERED** that Ian Wallace is substituted as Respondent.

**IT IS FURTHER ORDERED** that Petitioner's motion for leave to amend his petition is **GRANTED** as to the request to add claims and **DENIED** as to his request for appointment of counsel and for an evidentiary hearing. [Doc. 40]

**IT IS FURTHER ORDERED** that Petitioner's motion for a judicial hearing, motion requesting a federal hearing, and motion for discovery are all **DENIED**.  [Docs. 48, 49, 53]

**IT IS FURTHER ORDERED** that Petitioner's motion to strike the State's response to the show cause order and his motion for declaration of unopposed affidavit of expert witness are each **DENIED**.  [Docs. 47, 50]

**IT IS FURTHER ORDERED** that Petitioner's motion for leave to file an amended traverse and his motion for the Court to consider a news article and new case law are each **GRANTED**.  [Doc. 52, 54]

**IT IS FINALLY ORDERED** that Petitioner's 28 U.S.C. § 2254 petition for a writ of habeas corpus and amended petition are **DENIED** without further proceedings.  [Docs. 1, 40]

A separate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this  16th  day of September, 2014.